Filed 2/27/23  In re D.S. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re D.S., a Person Coming Under the Juvenile Court Law. | B316477 |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>D.S.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. NJ29036) |

        APPEAL from an order of the Superior Court of Los Angeles County, J. Christopher Smith, Judge.  Reversed.

        Elana Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.

Following a contested hearing, the juvenile court sustained a Welfare and Institutions Code[1] section 602 petition, finding that minor D.S. committed murder (Pen. Code, § 187, subd. (a)) and attempted murder (Pen. Code, §§ 187, subd. (a) & 664) under the theory that he directly aided and abetted the crimes by acting as a getaway driver. The court found that the murder and attempted murder were willful, deliberate, and premeditated. D.S. was declared a ward of the court and placed on probation. He was permitted to remain in his parents' home.[2]

D.S. appeals from the juvenile court's order sustaining the section 602 petition. He contends that there was insufficient evidence to establish that he knew of any plan to commit the shooting, shared in the shooters' intent to kill, or acted in any way to assist in the shooting. He further contends that the trial court abused its discretion by admitting the testimony of an investigating officer identifying D.S. as the person depicted in surveillance videos, when that investigating officer had no personal familiarity with D.S.

We agree with D.S. that the evidence was insufficient to support his convictions, and we reverse the trial court's order. In light of our disposition, we need not reach the issue of whether

---

[1] All further references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Prior to being tried for the murder and attempted murder, D.S. admitted to a petition for a burglary committed after those crimes. Because the burglary was his most recent offense, D.S. was ineligible for commitment to the Division of Juvenile Justice.

the trial court abused its discretion by admitting the officer's testimony regarding identity.

**FACTS**

*Prosecution Evidence*

### The Shooting

At 1:44 a.m. on July 29, 2018, police officers responded to a report of a shooting in front of a house located at 1037 West 43rd Street in Los Angeles, within the gang territory of the Rollin' 40's Neighborhood Crips (Rollin' 40's). When officers arrived, they saw people yelling and a deceased male lying on the sidewalk. The male victim had a gunshot wound above his left nipple, and another on his left shoulder, which were later determined to be the cause of his death. There were numerous spent cartridge casings and bullet fragments from a .40-caliber firearm and nine-millimeter handgun in the immediate vicinity. Multiple cars in the area had been shot, and the ground was littered with shattered glass. Police officers encountered a second victim, minor C.D., inside a nearby house. C.D. was bleeding from a wound in her left hand. She was crying and seemed shocked and in pain. C.D. told officers she was shot outside the house.

### The Investigation

Los Angeles Police Department Officer Robert Fraga investigated the incident. Officer Fraga recognized the dead man at the scene as Jasuan Hall. The officer had multiple prior

3

contacts with Hall, who had admitted to the officer that he was a member of the Rollin' 40's.

Police obtained video footage from multiple surveillance cameras near the scene of the shooting and near 5-Duce Hoover[3] gang member Casey Hervey's house, located at 606 53rd Street in Los Angeles.[4] Officer Fraga testified regarding what the videos depicted and identified D.S. as appearing in some of them.

Officer Fraga testified that he did not use booking photos or a driver's license to identify D.S. The officer compared video recorded at 608 West 53rd Street to photographs posted on social media. Officer Fraga had never personally seen D.S. before identifying him, and had not met him prior to trial. The social media photos Officer Fraga used to identify D.S. were not identified, described, authenticated, or offered as evidence at trial. Officer Fraga did not recall how many social media photos he had reviewed. The officer testified that, in the surveillance videos that did not clearly show D.S.'s face, he was able to identify D.S. through his clothing. Officer Fraga described D.S. as wearing long pants with stripes along the outside of the legs

---

[3] We use the spelling of 5-Duce as reflected in the reporter's official transcript.

[4] Officer Fraga referred to Hervey's house as 606/608 West 53rd Street throughout the testimony. The 606 and 608 West 53rd Street addresses are for two separate residences located on the same lot. Video was recovered from 608 West 53rd Street. The residence faces the street and is not associated with Hervey. Hervey's residence, 606 West 53rd Street, is located to the south, directly behind 608 West 53rd Street. It is accessed by a driveway that runs along the east side of both residences and provides parking next to 606 West 53rd Street.

and a reflective logo consistent with Adidas-style sweatpants. D.S. wore a long-sleeved jacket or windbreaker with a hood that had stripes down the sleeves.

Officer Fraga testified that he reviewed surveillance footage that showed D.S. arriving at Hervey's house in a white, four-door sedan on July 28, 2018, around 9:30 p.m.[5] The officer viewed video of multiple people and cars coming to and leaving the house all night. D.S. came and went in the white sedan several times before 11:47 p.m. Officer Fraga reviewed video showing that Joshua Bly and Destaney Tillis arrived at Hervey's house between 9:30 p.m. and 11:45 p.m.[6] Both Bly and Tillis were members of the 5-Duce Hoover.

---

[5] Officer Fraga was not a percipient witness. His testimony regarding the period from 9:30 p.m. to 11:47 p.m. was based upon his review of video recordings that were not admitted into evidence.

[6] When asked how he identified people who were "involved in this incident," Officer Fraga testified that he was able to "identify suspects" based on "the totality of [the] investigation" and from there develop a "suspect pool." At trial, he identified D.S., Hervey, Bly, and Tillis in the videos depicting the areas outside 606 and 608 West 53rd Street. Neither Officer Fraga, nor any other witness, identified any of these individuals in videos taken at other locations. None of these individuals were identified as shooters by any witness, and no witness offered any testimony as to the identity of the shooters. Other than identifying Hervey, Bly, and Tillis as persons in the suspect pool, there was no evidence or argument presented by the prosecution regarding their alleged roles in the crimes. Numerous other individuals depicted in the videos taken of the area outside 606 and 608 West 53rd Steet were not identified.

5

The video depicted D.S. and Bly walking out of Hervey's house, with a group of males whom Officer Fraga could not identify, at 11:43 p.m. D.S. and several other men walked past a white sedan parked next to Hervey's house and continued northbound up the driveway toward West 53rd Street. D.S., Bly, and several of the men then turned and walked back down the driveway in the direction from which they came. The white sedan is briefly illuminated when D.S. uses a remote key to open it. Around 11:48 p.m., the white sedan backs out of the driveway and travels east on West 53rd Street, followed by a Honda Accord.

Officer Fraga testified that there was no evidence regarding where the white sedan and the Accord went prior to 12:38 a.m., when they were next captured on video. At 12:38 a.m., the video footage shows a white four-door sedan and an older tan car that appears to be a Honda Accord, driving westbound past 1037 West 43rd Street. The video captures the shooting, which took place at 1037 West 43rd Street at 12:41 a.m., three minutes later. In Officer Fraga's opinion, the three people moved surreptitiously toward the victims, hunching over and using parked cars to conceal themselves. The video then shows "muzzle flashes" and two unidentified people appear to be firing guns. All three people then flee from the scene, running west on West 43rd Street toward Kansas Avenue.

Officer Fraga next testified that shortly after the shooting, the video depicts the white and tan cars driving southbound on Kansas Avenue.[7] The two cars then separate and go in different

---

[7] The video depicts two cars approaching the intersection of Kansas Avenue and Vernon Avenue. It is impossible to identify

6

directions. The white car turns east onto 51st Street and continues to Vermont Avenue. Because none of the video that Officer Fraga reviewed showed the white car traveling south on Vermont Avenue past 54th Street, he deduced that the sedan must have turned east or west onto West 53rd Street. At approximately 12:45 a.m., the video shows a white sedan turning into the driveway at 608 West 53rd Street. The driver parks next to the residence at 606 West 53rd Street and exits the vehicle. The driver is wearing a sweat suit with the hood pulled up and no visible stripes or Adidas logo. His face cannot be seen. He walks into Hervey's house. Officer Fraga opined that the driver was D.S. He explained, "The basis of that is comparing images from [D.S.] to the image in the video. And on that video . . . there's this individual, [D.S.'s] face is recognizable on that video."[8]

     D.S. returned to the white sedan several times, beginning at approximately 1:11 a.m. Before he returns to the vehicle the video does not depict a license plate on the white sedan. D.S. returns to the vehicle, opens the trunk, and appears to put a license plate on the sedan. D.S. later closes the trunk, and a reflective license plate is visible.

---

the first vehicle. The second vehicle appears to be a white sedan consistent with the vehicle that passed the scene prior to the shooting.

[8] Officer Fraga did not explain how he was able to identify D.S. without seeing his face. Our review of the video reveals that three to four different males present at Hervey's house that night were wearing light-colored sweat suits similar to the sweat suit that the driver is wearing when he exits the white sedan in the video.

7

The video shows D.S. walking over to Bly and Tillis, who are standing in the driveway, at approximately 1:16 a.m. D.S. is depicted shaking hands with Hervey in the driveway at 1:21 a.m.

On the afternoon of July 31, 2018, Los Angeles Police Department Officer Albert Vasquez of the gang enforcement unit observed Hervey and Tillis pulling a black bag from shrubs on the side of Hervey's house. Hervey and Tillis ran when they saw the officers. The officers started to give chase, but then they saw Hervey's mother trying to get rid of the black bag. The officers confiscated the bag, which had a black nine-millimeter Beretta inside it. The officers searched the area and found two more pistols inside a cinderblock wall next to the driveway: a .40-caliber Springfield and a nine-millimeter Smith & Wesson. A firearms examiner test fired the nine-millimeter Beretta and determined that the gun was used to discharge a .40-caliber spent shell casing found near the scene of Hall's death. Officer Vasquez testified that he did not know D.S. and had never met him.

**The Motive**

On July 28, 2018, several hours before the instant crimes took place, Marquis Ford, a member of the 5-Duce Hoover gang, was shot at 88th Street and Vermont Avenue in Los Angeles. Ford survived, but another person, who was not a member of a gang, was struck by gunfire and killed. There was no evidence presented regarding the shooter's identity or gang affiliation, if any.

Los Angeles Police Department Officer Walter Lawetzki testified as a gang expert for the prosecution. Officer Lawetzki

was a member of the gang enforcement detail assigned to monitor the 5-Duce Hoover gang and other gangs. The 5-Duce Hoover gang has several rivals. The Rollin' 40's are their main rivals, and they control 43rd Street between Kansas and Vermont Avenues. Officer Lawetzki testified that there were shootings and assaults between the gangs. If a 5-Duce Hoover member was shot, the gang would retaliate with like or greater force. Officer Lawetzki was not familiar with D.S.

### Defense Evidence

D.S. did not present evidence in his defense.

### Juvenile Court's Decision

The juvenile court stated:

"So from the evidence I heard during the trial I heard from Detective Fraga who's the lead detective. And he explained that earlier in the day and the time of this shooting took place—I'm assuming that would be July 28—that there was a 5-Duce Hoover Crip by the name of Mark Keyford who had been shot and a bystander had been killed. We know from Officer Lawetzki, who's the gang expert who testified, that retaliation is part of the gang culture.

"Additionally we heard from Officer Lawetzki that Rollin' 40's Neighborhood Crips are bitter rivals of the 5-Deuce Crips. There was evidence that came out that from the array of photos that started with, associated with that those individuals were known 5-Duce Hoover Crip gang members. Evidence was also presented that the decedent in our case, Jasuan Hall, was a

9

known 40 Neighborhood Crip. And we know Detective Fraga had multiple encounters with Hall prior to the date of the shooting, knew him to be a 40's Neighborhood Crip gang member through his tattoos and associations with a moniker known as Hard Head. And, also, we know from Officer Lawetzki that the location of this shooting occurred in Rollin' 40's gang territory.

"And so it's clear to me the homicide was motivated out of retaliation based on a conflict between these two gangs."

The juvenile court recounted that a shell casing found in the area where the shooters had been matched a .40-caliber firearm that was recovered from a wall at Hervey's residence.

The juvenile court continued:

"Then we have the surveillance footage. I know that the defense has raised the argument that the surveillance footage was not efficient in which to identify her client, but I wanted to take an additional look at that evidence again, because during the course of the trial it appears to me that was, in fact, [D.S.].

"I have seen [D.S.] for the last two years. I've looked at the photographs that were presented during this trial. His hair is different today than it was back then. I see the body. I see the hairline and all of that, and I'm convinced beyond a reasonable doubt that the individual in the video is, indeed, in fact [D.S.]."

The juvenile court acknowledged that the video was often of poor quality, but stated that the court could identify D.S. in the video through the distinctive Adidas clothing he wore, and because "the stature is specific."

The court stated that it was clear D.S. was the driver of the white car when it left Hervey's house, and acknowledged, "I know there was a period of time between when they leave that location and when they, when the shooting actually occurs. Some of that

10

is not captured from the evidence in this case." Nonetheless, the court found that the white car was in the area at the time of the shooting and that D.S. exited the car "shortly thereafter" when it arrived at Hervey's house.

The court continued:

"It's also clear to me from the evidence that at some point [D.S.] comes back out of the house, and he pops the trunk to the car. And I'm not sure if he puts on a plate or removes a plate, but it's clear to me that once the trunk was closed there was a reflective item on the trunk of the car which appears to be a license plate that wasn't there before. And so that further informs me of his intent.

"I believe that the evidence affords the fact that they gathered together and he, in efforts to retaliate against the shooting and that he was all part of it, that he was the driver of the vehicle, that he dropped them off, that he waited for them to run back after the shooting and to transport them back out of the location, so that they would not be caught or arrested.

"And, so, I think the People have put on sufficient evidence beyond a reasonable doubt."

## DISCUSSION

### *Legal Principles*

"The standard of review in juvenile proceedings involving criminal behavior is the same as that required in adult criminal trials: We review the entire record in the light most favorable to the judgment to determine whether substantial evidence supports the charge, so that a reasonable trier of fact could find

11

guilt beyond a reasonable doubt." (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1518.) " '[S]ubstantial evidence,' that is, evidence that is ' " 'reasonable . . . , credible, and of solid value' " ' is required, not just *any* evidence. [Citation.] In particular, a reasonable inference from the evidence ' " 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' " ' " (*People v. Sanford* (2017) 11 Cal.App.5th 84, 91–92.) " '[W]hen a reversal rests upon the ground that the prosecution has failed to produce sufficient evidence . . . , the Double Jeopardy Clause bars the prosecutor from making a second attempt at conviction.' [Citation.] When the evidence is legally insufficient, it means that ' "the government's case was so lacking that it should not have even been *submitted* to the [trier of fact]." ' " (*People v. Eroshevich* (2014) 60 Cal.4th 583, 591.)

A " 'person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.] ' "Mere presence at the scene of a crime which does not itself assist its commission or mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting." [Citations.] "To be liable for a crime as an abettor, the accused must have instigated or advised the commission of the crime or have been present for the purpose of assisting the crime. He must share the criminal intent with which the crime was

committed. Neither his mere presence at the scene of the crime nor his failure, through fear, to prevent a crime establishes, without more, that an accused was an abettor." ' " (*People v. Burgos* (2022) 77 Cal.App.5th 550, 559–560.)

*Analysis*

We begin with the observation that there was gang evidence introduced in this case that had little, if any, relevance to D.S.'s personal motive or intent. It has been repeatedly emphasized by our courts that such evidence may be highly prejudicial to a defendant. (See *People v. Albarran* (2007) 149 Cal.App.4th 214, 230–232.)

The People theorized that earlier on the day of the shooting, a 5-Duce Hoover gang member was shot, and that the instant shooting was committed in retaliation for that earlier shooting. The People postulated that 5-Duce Hoover gang members gathered at Hervey's house, planned a retaliatory shooting, and then left in a caravan to kill a Rollin' 40's member on West 43rd Street, within Rollin' 40's territory.

Evidence was presented that the earlier shooting occurred, and that one of the people who was shot was a 5-Duce Hoover gang member. An officer testified that Hervey, Bly, and Tillis were also 5-Duce Hoover gang members, and that they were all present at Hervey's house on the night of the shooting. A gang expert testified that the 5-Duce Hoovers and the Rollin' 40's were major rivals, and that the 5-Duce Hoovers would retaliate in kind for the earlier shooting of their fellow gang member.

However, even if we assume that D.S. was correctly identified as being the driver of the white car parked at Hervey's

13

house that night, there was no evidence presented that D.S. himself was a member of any gang, or that he associated with gang members outside of the evening in question. Notably, neither Officer Lawetzki, who was part of the gang enforcement detail assigned to monitor the 5-Duce Hoovers, nor any other officer who testified, had ever met D.S. Additionally, the evidence did not establish that more than three of the many people at Hervey's house that night were 5-Duce Hoover gang members. Officer Fraga testified, and the video evidence showed, that there were numerous people going in and out of Hervey's house all evening (including D.S.), most of whom the officer was unable to identify. Of the individuals present, Officer Fraga identified only Hervey, Tillis, and Bly as 5 Deuce gang members. None of the shooters depicted in the video were identified as members of the 5-Duce Hoover or any other gang. There was no expert testimony to explain why non-gang members would be involved in a retaliatory shooting. From this evidence, ascribing a gang motive to D.S. is speculative.

There was also no evidence that D.S. met with gang members at Hervey's house to plan the shooting. Officer Fraga testified that people and cars were coming and going all night, and that D.S. left and came back several times. There was no testimony that Hervey was present at the house before the shootings, and the testimony regarding Tillis and Bly was that they arrived sometime between 9:30 p.m. and 11:45 p.m., based on Officer Fraga's review of video that was not admitted into evidence. There was no evidence regarding how long Tillis and Bly were at Hervey's house, or if they were ever present in the house at the same time that D.S. was, or that D.S. was in the same room in the house as the alleged gang members, or what, if

14

anything, anyone in the house discussed with anyone else. In short, there was no evidence that a meeting of 5-Duce Hoover gang members took place at Hervey's house or that D.S. attended it. At most, the video shows that D.S. and Bly talked briefly before the white sedan pulled out of the driveway at 11:47 p.m.

Additionally, there was no evidence that the earlier shooting was committed by a Rollin' 40's member, or that anyone at Hervey's house that night believed that to be the case. There was no evidence that the earlier shooting took place in either gang's territory. The testimony established that the shooting took place on 88th Street and Vermont Avenue, which is over 40 blocks away from the instant shooting and more than 30 blocks away from Hervey's home. In fact, there was no evidence presented regarding the motive behind the earlier shooting, of which a non-gang member was also a victim.

Finally, there was no evidence presented that the shooters in the instant case were 5-Duce Hoover gang members. No one testified to their identities, and there was no suggestion that the three people depicted in the video recording of the shooting could also be seen in the video recordings of the area around Hervey's house before or after the shootings that night. No witness identified anyone other than D.S. and Bly in either of the cars that were purported to have transported the shooters to and from the scene.

At most, all of this evidence may have supported the inference that Hervey, Bly, and Tillis had a motive to kill Hall, who was a Rollin' 40's member, in retaliation, but even that inference is tenuous absent evidence that the Rollin' 40's were responsible for the earlier shooting or that 5-Duce Hoovers committed the shooting. The strongest evidence connecting the

15

5-Duce Hoovers to the murder was the single shell casing that matched the firearm found in the cinderblock wall at Hervey's home. That evidence supported the inference that Hervey and Tillis, who were attempting to conceal another firearm, were connected to the murder. However, there is no evidence that D.S. or Bly spoke with either Hervey or Tillis before the white sedan left Hervey's house 45 minutes prior to the shooting. There is no evidence connecting D.S. to the gun.

The People did not allege that D.S. was one of the shooters or that he was present at the scene of the shooting—nor could they because there was no evidence to support either conclusion. The prosecution theorized that D.S. was a getaway driver or a lookout, but there is no evidence that this was the case, either. There was no evidence that D.S. transported any of the shooters to or from the scene. There is no footage of anyone leaving or entering the white sedan in the vicinity of the shooting. The only video of anyone entering or leaving the sedan was recorded at 608 West 53rd Street, approximately 10 blocks away, and none of the people who entered or exited the vehicle were identified as shooters. There is no evidence that D.S. was close enough to the scene to act as a lookout or that he had any means of communication to warn the shooters as a lookout. The video of the white sedan and the Accord driving on West 43rd Street ends after the cars reach the corner or West 43rd Street and Kansas Avenue, so it is impossible to tell what route the white sedan traveled after that, even if we assume that the car captured on video at the corner of Kansas and Vernon Avenues five minutes later is the same white sedan.

The white sedan was described only as a white, four-door sedan. Although the video shows that the white sedan that

16

backed out of Hervey's driveway at 11:45 p.m. was a KIA, no model or license plate number can be discerned from the video. There was no evidence offered regarding who owned the vehicle, or whether D.S. owned or had access to a similar vehicle. Even assuming that the video recordings depict D.S. leaving Hervey's house at approximately 11:45 p.m. in the white sedan, that occurred approximately 50 minutes before the shooting. There is no evidence regarding where D.S. or the white sedan were during that 50-minute period. The video does not establish that D.S. was the driver of the white sedan depicted near the scene of the crimes, as it is impossible to see the driver of that vehicle in the surveillance video. It is also not possible to identify who drove the white sedan to Hervey's house after the shooting. The driver is depicted briefly, wearing a full sweat suit with the hood up. The sweat suit has no defining characteristics that could link it to D.S., such as the striping or the reflective logo shown in other video where D.S.'s face is captured by the camera. Multiple people wearing full sweat suits are depicted in the videos recorded at 608 West 53rd Street.

The most probative evidence of a connection to the charged crimes is video of D.S. putting what appears to be a license plate on the white sedan at 606 West 53rd Street approximately 30 minutes after the shootings, and the video of D.S. shaking hands with Hervey in the driveway. But this, even in conjunction with the evidence that D.S. spent time at Hervey's house when people linked to the shooters may also have been present, is not enough to raise more than a suspicion of D.S.'s involvement in the crimes. There is no evidence that any of the shooters was ever in a white car, or in any car. If the shooters were not in the sedan, D.S. could not aid them in evading capture by changing

17

the license plate. It is an equally plausible inference that D.S. changed the license plate to avoid implication in crimes in which he was not personally involved, and was friendly with Hervey to forestall trouble between them. There is no evidence to support one inference over the other, beyond mere speculation.

We find the People's arguments to the contrary unpersuasive. The People compare the instant case to *People v. Hill* (1998) 17 Cal.4th 800. In *Hill*, three men approached a car, spreading out to surround it. (*Id.* at p. 851.) The defendant robbed the driver and attempted to murder him, while one of the other men took the passenger's purse. (*Ibid.*) Our Supreme Court held this evidence was sufficient to establish that the defendant and the man who robbed the passenger were working together and that the defendant aided and abetted the robbery of the passenger whose purse was taken. (*Id.* at pp. 851–852.)

The present case is distinguishable. In *People v. Hill, supra*, 17 Cal.4th 800, the defendant and the man who took the passenger's purse arrived at the scene together, remained at the scene together, and simultaneously committed robbery— defendant of the driver and the other man of the passenger. Here, there is no substantial evidence that D.S. was at the scene of the shooting, and it was not alleged that he was among the shooters. The defendant in *Hill* was at the scene engaging in the identical crime, whereas D.S. was removed from the scene, and engaged in the otherwise legal activity of driving a car. D.S.'s participation was speculative.

This case is also distinguishable from *People v. Miranda* (2011) 192 Cal.App.4th 398. In *Miranda*, the evidence established that the victim was smoking marijuana in his SUV at a gas station. Four males, one of whom was later identified as

18

the defendant, parked nearby.  While one of the individuals went into the gas station's convenience store; two others approached the open driver's side door of the victim's SUV while the defendant stood in front of the SUV.  One of the men asked the victim where he was from, which the victim understood as asking whether he had a gang affiliation.  The victim indicated that he was not a gang member.  The man identified himself as being from a gang, and pulled a chain off the victim's neck.  As the victim chased after the man who took his necklace, he heard gun shots.  Turning in the direction of the shots, the victim saw the defendant firing a handgun at him; the victim was shot twice.  (*Id*. at pp. 403–404.)  A gang expert testified that gang members commit crimes together to make a greater showing of force, and that they support each other in committing crimes.  (*Id*. at p. 409.)  Based on the victim's account of events and identification of the defendant as the shooter, the appellate court held "that defendant was the direct perpetrator of the attempted premeditated murder, robbery, assault with a firearm and possession of a firearm by a felon" (*id*. at p. 407), despite the jury's " 'not true' " finding on gun use allegations, because substantial evidence supported the inconsistent verdicts (*id*. at pp. 405–406).

Alternatively, the court in *People v. Miranda, supra*, 192 Cal.App.4th at page 409, held that substantial evidence supported a finding that the defendant aided and abetted the robbery as a backup or lookout, even discounting the victim's identification of the defendant as the shooter.  The court observed that the defendant was with the men that he personally claimed to be the robbers before, after, and during the robbery and shooting.  (*Ibid*.)  The defendant was a former gang member and

19

was associating with the perpetrators who he knew to be current members or affiliates of the same gang. (*Ibid*.) The defendant also admitted that he got out of the vehicle with the others to get some marijuana from the victim. (*Ibid*.)

In the instant case, D.S. was not with the shooters during the shootings and did not identify the shooters. No evidence was presented that D.S. was a gang member or that he had some other motive to assist in the shooting. He did not approach the victims and did not attempt to prevent their escape or otherwise facilitate the shooting.

Finally, *People v. McDaniels* (1980) 107 Cal.App.3d 898, also differs from this case. There, the appellate court held the evidence was sufficient to support a finding that the defendant, who had been positively identified as the shooter at trial, was the perpetrator. (*Id*. at pp. 901, 903.) Alternatively, the court held that substantial evidence supported the finding that the defendant aided and abetted first degree murder. (*Id*. at p. 903.) The court recounted that the victim was "kneeling with his hands in the air. . . . [when] the gunman squeezed off five shots; the first two knocked [the victim] to the ground, the third came in response to [the victim's] violent kicking, and two final shots to the head, fired from the distance of about a foot, were added even as the gunman's friends had turned away." (*Id*. at p. 901, fn. omitted.) "[F]our witnesses placed defendant among the persons who cornered and stood over [the victim] before he was shot." (*Id*. at p. 904.) The appellate court stated that regardless of whether the defendant pulled the trigger he "was one of those present at the discussions held by the [gang] immediately before their venture was undertaken, and . . . along with the others, he

20

departed the murder scene as soon as the shooting had occurred. Further, he later falsely denied his presence at the event." (*Ibid.*)

Here, there was no evidence that D.S. stood over either of the victims when they were shot, let alone that he loomed over a victim watching as the victim was shot multiple times while on his or her knees. It was not alleged that he was present at the scene of the shootings. There was no evidence that D.S. was privy to any discussions about the shootings before they occurred, or that he lied regarding his whereabouts afterward. The circumstances are not analogous.

For all of these reasons, we conclude that there is not sufficient evidence that D.S. intended to kill anyone who was shot on the night of the crimes, or that he did anything to facilitate the crimes. His convictions for murder and attempted murder are reversed.

## DISPOSITION

The juvenile court's order is reversed.
NOT TO BE PUBLISHED.


MOOR, J.

We concur:


RUBIN, P. J.          KIM, J.

21